1   Q   Because you knew at the time that you
2   sent out the press release that if, that Mr.
3   Paoa's felony record related to one single
4   incident in 1984, correct?
5   A   That's correct, from the news articles
6   that I read.
7   Q   You say later on in that paragraph --
8   press release was not directed at Hawaii or
9   anyone in Hawaii. Where does Hoolae Paoa live?
10  A   I don't know.
11  Q   As you sit here today, you have no idea
12  where Hoolae Paoa lives?
13  A   That's, correct.
14  Q   You say further on in that sentence,
15  "Hawaii does not have any interest in whether
16  slot machines are legalized at the Guam
17  Greyhound facility." Does Hawaii have an
18  interest in protecting its citizens from lies
19  and untruths?
20      MS. ARRIOLA:   Objection. That calls
21  for a legal conclusion, it calls for
22  speculation, it's vague and ambiguous.
23      MR. VOSS:   Oh! You got to be kidding
24  Ms. Arriola. You had her say in -- if you're
25  going to have her opine in her affidavit as to

1  disclose who they are." Do I understand this
2  correctly that as of July 24th, 2006 you did not
3  know who the backers of the initiative were?
4      A    They had not come out publicly about
5  them backing the initiative.
6      Q    What did you know if anything, as to
7  who were the backers of the initiative as of
8  July 24th, 2006?
9      A    I was aware that there may have been a
10 change in ownership around that time.
11     Q    Change in ownership of who or what?
12     A    Guam Greyhound.
13     Q    Anything else you knew as of that date?
14     A    Not specifically.
15     Q    I'm showing you what we've marked for
16 identification purposes, is Deposition Exhibit
17 5, Ms. Marati.
18          (Plaintiff's Exhibit 5 was marked for
19 identification)
20     Q    Is this the e-mail from a John Baker
21 from which you got the links, that form the
22 basis for the statements and allegations in
23 your press release?
24     A    Yes, that's correct.
25     Q    Where did John Baker get this

1  information from?
2     A   I don't know.
3     Q   What, if anything, did Mr. Saad tell
4  you regarding where this information was
5  obtained from?
6     A   He did not tell me the source.
7     Q   Okay. Well, what did he tell you?
8     A   As I said earlier, he called and said
9  he tried to send this to Lee Webber, it got
10 bounced back and if I could please get the e-
11 mail, the correct e-mail from Mr. Webber so I
12 could forward it successfully, which I did.
13    Q   I noticed that he misspelled the Gannet
14 down there, I assume that was the error, right?
15    A   I don't recall.
16    Q   In any event, anything else that Mr.
17 Saad told you in that conversation?
18    A   I don't remember right now, but that
19 was the objective of the conversation.
20    Q   And we discussed earlier that we do not
21 have a copy or we were not provided a copy of
22 your e-mail to Mr. Webber. What if anything
23 did you include on the forward of your e-mail
24 to Mr. Webber?
25    A   I don't have that, so I don't remember

```
 1  what I said, if anything.
 2       Q   Who is Lee Webber?
 3       A   Lee Webber is the publisher for Pacific
 4  Daily News.
 5       Q   On this e-mail, assuming Mr. Baker
 6  wrote it -- well, let me ask the question again
 7  just so I'm clear.  And if I've asked
 8  previously, I apologize.  Do you have any idea
 9  who John Baker is?
10       A   No, I don't.
11       Q   At any time did you ever ask anyone who
12  John Baker was?
13       A   No, I didn't.
14       Q   The e-mail purports to be from a
15  guamgaming@hotmail.com.  Do you have any idea
16  who holds that e-mail address?
17       A   No, I don't.
18       Q   Do you know if John Baker is a
19  pseudonym for anyone?
20       A   No, I don't.
21       Q   The e-mail when it was drafted by John
22  Baker or otherwise has the statement, currently
23  in Guam heading the signature drive - convicted
24  felon.  I take it you didn't call -- well, did
25  you contact Mr. Baker to find out what was the
```

1  basis for her -- through the issuance of the
2  press release. And she's already testified
3  that she made her own investigations, she went
4  into the links and she did her own Google
5  search of -- or search engines for the names of
6  these people who are listed in the e-mail. So,
7  I just want to object to the characterization
8  of her testimony.
9           MR. VOSS: My question really goes to
10 the allegation in the press release that he was
11 currently in Guam, currently heading the
12 signature drive not the other elements.
13 BY MR. VOSS:
14     Q  Did you contact Mr. Baker to determine
15 what was the basis for his belief that Mr. Paoa
16 was currently in Guam, currently heading the
17 signature drive and a convicted felon?
18     A  I did not contact John Baker.
19     Q  Why not?
20     A  When I was reviewing the rest of the
21 articles with regards specifically to the
22 convictions, or conviction, all the articles
23 basically were similar in what his background
24 had been.
25     Q  Did any of those articles say that he

1    A    I believe I may have been blank copied
2  on that.
3    Q    So John Baker knew who you were,
4  whoever he was?
5    A    I don't know that.
6    Q    You didn't think it was unusual that
7  this mysterious John Baker was BCC-ing you on
8  an e-mail to the Pacific Daily News?
9    A    No, I don't know.
10   Q    Is it your best recollection that you
11 were blind copied on the e-mail from this
12 mysterious John Baker to Lee Webber at the
13 Pacific Daily News?
14   A    Is it -- I'm sorry?
15   Q    Is that your best recollection of what
16 happened?
17   A    Yes, that's -- yes.
18   Q    Your e-mail begins, "When I visited the
19 Greyhound operation last week to pick up
20 materials." What materials were you picking up
21 at the Greyhound operation?
22   A    I picked up the draft initiative and I
23 picked up a commission schedule that the
24 organizers were paying individuals to pick up
25 the signatures.

1 received another e-mail, is that right?
2     A    I don't know, I don't know.
3         MR. VOSS:  Off the record.
4         (Off the record from 11:55 a.m. to
5 12:02 p.m.)
6     Q    I'll show you what we've marked for
7 identification purposes as Deposition Exhibit
8 5, which is an e-mail on top of an e-mail that
9 you sent Ms. Marati.
10        (Plaintiff's Exhibit 5 was marked for
11 identification)
12        So let me just ask you that fairly, is
13 the original message at the bottom of this e-
14 mail, is that a true and correct copy of an e-
15 mail that you sent to those people listed on
16 the two lines on or about July 27th, at 11:57
17 a.m.?
18    A    The first sentence was what I wrote.
19 The following, with the 2nd paragraph beginning
20 with the word following, that came from the
21 original e-mail that was sent from Baker.
22    Q    Now, if you look at the original e-mail
23 from Baker, you're not copied on that.  So, how
24 were you able to copy something that you
25 weren't copied on?

1  of your duties and responsibilities for the
2  Bank of Guam, since you sent it out on your
3  Bank of Guam e-mail address?
4      MS. ARRIOLA:  I'm going to object to
5  that and I don't think it has anything to do
6  with the motion to dismiss.  I think you're
7  trying to harass her, you're being
8  argumentative.  You know, if it's a Bank of
9  Guam address, clearly it's a Guam address, I
10 mean, that's all you need to know for purposes
11 of the motion to dismiss.
12 BY MR. VOSS:
13     Q   Please answer the question.
14     MS. ARRIOLA:  No, I'm going to instruct
15 her not to answer.
16     MR. VOSS:  Okay, so that's another one
17 you're instructing her not to answer?
18     MS. ARRIOLA:  Yes.
19 BY MR. VOSS:
20     Q   Okay.  So, to the people you sent this
21 defamatory stuff to, one of them is Mr. Saad,
22 that's the Mr. Saad you're referring to
23 earlier?
24     A   That is correct.
25     Q   Okay.  One is a hali@tniguam.com, that

```
 1  is Mr. Cruz, yes?
 2       A    Dr. Cruz.
 3       Q    Who is mbaldyga@baldyga.com?
 4       A    Mark Baldyga.
 5       Q    Okay.  Is he a member of Lina'la Sin
 6  Casino?
 7       A    He and -- that's part of the Baldyga
 8  group.  They were part of the membership along
 9  with Mr. Saad in the 2004 anti-gambling
10  initiative.
11       Q    That wasn't my question.  Is he or is
12  he not a member of Lina'la Sin Casino?
13       A    I don't believe he is, I don't know.
14       Q    mcguzman@ite.net.  Who is MC Guzman?
15       A    This is Monica Guzman.
16       Q    Oh, is this is the one you referred to
17  earlier who is the Executive with the Make-A-
18  Wish Foundation, here on Guam?
19       A    That's correct.
20       Q    john.lee@fhwn.com, that's the Senior
21  Vice President of First Hawaiian Bank here on
22  Guam, correct?
23       A    Previously.
24       Q    And why were you sending it to Mr. Lee?
25       A    Mr. Lee was also a part of our
```

1  organization two years ago just to defeat
2  casino gambling.
3      Q   Is John Lee a member of Lina'la Sin
4  Casino?
5      A   I don't know.
6      Q   You say he's the former Senior Vice
7  President of First Hawaiian Bank.  When did he
8  retire?
9      A   Earlier this year, I'm not exactly sure
10 when.
11     Q   Did you know he retired at the time you
12 sent this e-mail out?
13     A   I'm not sure, I'm not sure.
14     Q   Any reason to send this e-mail to John
15 Lee, other than he was involved in the 2004
16 initiative?
17     A   No other reason, except for that.
18     Q   Did you receive any response from Mr.
19 Lee to this e-mail?
20     A   I don't recall.
21     Q   E-mail was also sent to
22 acalaw@netpci.com.  Who is acalaw@netpci.com?
23     A   This was sent to Jay Arriola.
24     Q   Why were you sending this information
25 to Jay Arriola?

```
 1        A    Also part of the 2004 group, all of
 2   these members have been part of the 2004 group.
 3        Q    Jay Arriola, is that your brother?
 4        A    It is.
 5        Q    Is Jay Arriola a member of Lina'la Sin
 6   Casino?
 7        A    I don't know.
 8        Q    What did Jay Arriola say or do, if
 9   anything, in response to this e-mail?
10             MS. ARRIOLA:    Objection, calls for
11   attorney/client privilege.    Don't answer that
12   question.
13   BY MR. VOSS:
14        Q    At this point it doesn't -- okay, let
15   me ask the foundation question.    Did you
16   understand at the time that you sent this e-
17   mail to Jay Arriola that he was your attorney
18   with respect to the facts and allegations
19   contained in the e-mail relating to Mr. Paoa
20   and the other backers of Guam Greyhound?
21             MS. ARRIOLA:    Objection.    Vague and
22   ambiguous.
23   BY MR. VOSS:
24        Q    Yes or no?
25        A    Can you repeat that again, please?
```

DEPO RESOURCES
George B. Castro
Court Reporter
Tel.(671)688-DEPO * Fax(671)472-3094

```
 1        Q    Was your press release attached as an
 2   attachment to all these e-mails?
 3        A    Yes.
 4        Q    I noticed that one of these e-mails is
 5   sent to something called saipantribune@.com.
 6   You sent it to the Saipan Tribune as well?
 7        A    I believe so.
 8        Q    So, that portion of your affidavit in
 9   your motion where you say, with this was sent
10   to the 7 news organizations in your affidavit,
11   that's incorrect?  In fact, you sent it to more
12   than 7 including the Saipan Tribune.
13        A    I need to check that.
14        Q    You need to check what?
15        A    Just to make sure that was in fact
16   sent.
17        Q    Well, respectfully Ms. Marati, you
18   produced this to me and just testified that
19   these were the e-mails that were sent to media
20   sources attached in the press release, now
21   you're changing that testimony?
22        A    I just need to double check that one.
23        Q    Since it now appears, at least based on
24   the documents that you've produced that there's
25   at least one media organization that you sent
```

1  this to that you didn't list in your motion or
2  your affidavit, any others?
3       A    I don't believe so.
4       Q    Okay. You're going to go check that
5  too, yes or no?
6       A    Of course.
7       Q    Okay. When will you let me know
8  whether or not any other parts of your
9  affidavit are not true?
10      A    I will verify those that were sent.
11      Q    Please do that within a week, I'd
12 appreciate that.
13      A    Yes.
14      Q    How did you happen to select these
15 particular organizations to send e-mails to?
16      A    They're all based in Guam.
17      Q    Any other reasons?
18      A    That's it.
19      Q    Okay. It's your testimony that you did
20 not send a copy of the press release to any
21 other person or entity than the individuals or
22 organizations attached in Exhibit 8, is that
23 correct?
24           MS. ARRIOLA:  I'm going to object, that
25 mischaracterizes her testimony.

```
 1            MR. VOSS:  In what respect?
 2            MS. ARRIOLA:  She said she has to check
 3   the one about Saipan Tribune.
 4   BY MR. VOSS:
 5       Q    Setting aside this Saipan Tribune one,
 6   which appears to be an additional source that
 7   you sent it to but not disclosed in your
 8   affidavit or motion, is it your testimony other
 9   than that fact that you need to check, you did
10   not send the press release to any other person
11   or entity anywhere?
12       A    That's correct.
13       Q    Is the press release still contained on
14   your computer?
15       A    I don't know, I think so.
16            MR. VOSS:  We'll mark this as the next
17   Exhibit in order, Exhibit 9.
18            (Plaintiff's Exhibit 9 was marked for
19   identification)
20            I'm showing you what we've marked for
21   identification purposes as Deposition Exhibit
22   9.  And direct your attention to the 2$^{nd}$ page of
23   this printed out e-mail where it says, Jackie
24   A. Marati wrote -- and for whatever reason,
25   this particular copy of the e-mail appears to
```

1   A   I don't remember doing that.

2   MR. VOSS: We'll mark this as the next
3   Exhibit in order.

4   COURT REPORTER: That will be number
5   15.

6   (Plaintiff's Exhibit 15 was marked for
7   identification)

8   Q   This is the article that you're
9   referring to that was part of the basis for
10  your press release including the allegations as
11  to Mr. Paoa, is that correct?

12  A   That's part of the sources of articles.

13  Q   This indicates it was downloaded on or
14  about July 29th, 2006, is that right?

15  A   That's what this indicates.

16  Q   And so you read and reviewed this prior
17  to issuing the press release, correct?

18  A   Prior to.

19  Q   Let's turn to page 3 where it appears
20  to have been circled. Is that your handwriting
21  circling this?

22  A   I believe it was.

23  Q   The Washington Post article which
24  you've testified as part of the basis for your
25  press release states, "Investigation also found

1  that Hoolae Paoa, a Hawaiian man" -- so you
2  knew actually as of July 29th, that Hoolae Paoa
3  was a Hawaiian man, is that correct?  I mean,
4  you testified you read it, this article, right?
5      A   I read the article.
6      Q   And so you knew as of July 29th, 2006,
7  that Hoolae Paoa was a Hawaiian man, yes?
8      A   That's what this story states.
9      Q   Yes.  And as a fact, you knew when you
10 sent out the press release, yes?
11     A   That's what the story states.
12     Q   That's not my question.  That was a
13 fact that you knew from this story when you
14 sent the press release out, yes?
15     A   That his race or his ethnicity was
16 Hawaiian.
17     Q   I don't want to repeat the prior
18 testimony, but did you make any effort to
19 verify with the Washington Post or anyone else
20 in Washington according to the allegations in
21 this Washington Post story prior to issuing the
22 press release?
23     A   Not directly with anyone from the
24 Washington Post.
25         MR. VOSS:  We'll mark this as the next

```
 1  article related to Hawaii, did you not?
 2          MS. ARRIOLA:  I object to that
 3  characterization.  Read through it.
 4  BY MR. VOSS:
 5      Q   Okay, most of them do, yes?
 6          MS. ARRIOLA:  Same objection.
 7  BY MR. VOSS:
 8      Q   The vast majority do, there's one about
 9  the joint operating.  But let's turn to the
10  last page --
11          MS. ARRIOLA:  No, I'm sorry, there are
12  articles from the Los Angeles Times, about
13  people in San Francisco, about the Seattle
14  Times, Quantanomo Bay, Cuba, you know.  I
15  disagree with your characterization.
16          MR. VOSS:  Okay.  Well, that's
17  something that we can debate on a motion.
18  BY MR. VOSS:
19      Q   But let's take a look at what you
20  looked at.  In the last page it says, "Hoolae
21  Paoa, a former Hawaii resident, with a record
22  of convictions through 1978 through 1997."  As
23  of this date, when you downloaded this on July
24  29th, 2006, you knew at the very least that
25  Hoolae Paoa was, according to Mr. Lind a former
```

1  Hawaii resident, correct?
2      A   That's what it says.
3      Q   Was this story by Mr. Lind part of the
4  basis upon which you used for your press
5  release on July 31st, 2006, relating to Mr.
6  Paoa?
7      A   With regard to the record of
8  convictions.
9      Q   So it's a, yes?
10     A   Yes, with regard to the record of
11 convictions.
12     Q   Having seen from Mr. Lind's website,
13 Mr. Paoa was at the very least a former
14 Hawaiian resident.  Did it occur to you that
15 perhaps it might be a good idea then to check
16 the criminal justice website in Hawaii to
17 verify this information from Hawaii?
18         MS. ARRIOLA:  Objection, asked and
19 answered.  You've already asked that question.
20         MR. VOSS:  I'm asking with respect to
21 this specific e-mail, since she was on noticed
22 as of this time related to Mr. Paoa's Hawaii
23 residency.
24         MS. ARRIOLA:  Former residence.
25         MR. VOSS:  You can argue that all you

1          (Off the record from 1:19 p.m. to 1:27
2  p.m.)
3          MR. VOSS: Let's mark the next Exhibit
4  in order.
5          COURT REPORTER: 17.
6  BY MR. VOSS:
7      Q   Ms. Marati, what's in front of you is
8  Exhibit 17, which is a copy of the Washington
9  Times story July 13th, 2004.  Again there's a
10 circling on the back page where it refers to
11 Hoolae Paoa, a Hawaiian business associate with
12 a criminal history.  Is that your circle on
13 there?
14     A   Yes, it is.
15     Q   Even though this particular copy
16 indicates it was e-mailed or downloaded rather
17 on or about August 9th, 2006.  Was this one of
18 the stories that you read prior to the issuance
19 of your press release on July 31st, 2006?
20     A   Yes, it was.
21     Q   And this article refers to Hoolae Paoa
22 as a Hawaiian business associate, yes?
23     A   It refers to it and I understood that
24 to be of his ethnicity.
25     Q   Did you make any effort to confirm

1  whether it was that ethnicity or place of
2  residence?
3     A    No.
4         MR. VOSS: This is the next Exhibit in
5  order. What would this one be?
6         COURT REPORTER: Number 18.
7         (Plaintiff's Exhibit 18 was marked for
8  identification)
9     Q    Although this copy indicates that it
10 was downloaded on August 14th, 2006, was this
11 one of the articles that you reviewed and
12 relied on as the basis for the allegations
13 against Mr. Paoa in your press release?
14    A    Among the other articles, yes.
15    Q    And in this article, it refers to Mr.
16 Paoa's business activities in Hawaii, does it
17 not?
18    A    It states that he started out in Hotel
19 Management, Hawaii.
20    Q    It also states that he met Mr. Scott in
21 the 90's when Scott was exploring gambling
22 possibilities in Hawaii, does it not?
23    A    It says that.
24    Q    It also says that the theft that Mr.
25 Paoa pled guilty to occurred in the state of